1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEBRASKA
2
      UNITED STATES OF AMERICA,    )
3                                  )
                Plaintiff,         )      8:08CV344
4                                  )      Omaha, Nebraska
      vs.                          )      July 31, 2009
5                                  )
      $35,000.00 IN UNITED STATES  )
6     CURRENCY,                    )
                                   )
7                Defendant,        )
                                   )
8     DANIEL K. HITCHCOCK,         )
                                   )
9                Claimant.         )

10

11                    TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE F. A. GOSSETT
12                UNITED STATES MAGISTRATE JUDGE

13

14                    A-P-P-E-A-R-A-N-C-E-S

15    FOR THE PLAINTIFF:   Ms. Nancy A. Svoboda
                           Assistant United States Attorney
16                         1620 Dodge Street
                           Suite 1400
17                         Omaha, NE  68102-1506

18    FOR THE CLAIMANT:    Mr. Justin J. Cook
                           Attorney at Law
19                         Lincoln Law, LLC
                           P.O. Box 83857
20                         Lincoln, NE  68501

21

22

23

24
      Proceedings recorded by electronic sound recording, transcript
25    produced with computer.

```
 1            (At 9:38 a.m. on July 31, 2009, the following

 2     proceedings were had:)

 3            COURTROOM DEPUTY:  All please rise.  This court is

 4     now in session.

 5            THE COURT:  Please be seated.  Good morning.

 6            MS. SVOBODA:  Good morning, Judge.

 7            THE COURT:  Case No. 8:08344, United States of

 8     America vs. $35,000 in United States Currency.

 9        Counsel for the government, please identify.

10            MS. SVOBODA:  Morning, Your Honor.  Nancy Svoboda on

11     behalf of the United States.

12            THE COURT:  For the defendant who's present.

13            MR. COOK:  Good morning --

14            THE COURT:  Excuse me, for the claimant who's

15     present.

16            MR. COOK:  Good morning, Your Honor.  Justin Cook on

17     behalf of the complainant -- claimant Daniel Hitchcock.

18            THE COURT:  Miss Svoboda.

19            MS. SVOBODA:  Judge, no opening statements or

20     anything, Your Honor, but I would like to at this time for

21     purposes of this hearing offer into evidence -- Judge, it was

22     previously marked for trial as Exhibit No. 4, and, quite

23     frankly, that's how all my numbers are -- everything's already

24     on it --

25            THE COURT:  That's fine.
```

1          MS. SVOBODA:  -- so if I may offer as Exhibit No. 4,

2     it is a copy of the video -- in-car camera of the traffic stop

3     at issue in this case previously delivered to the Court and,

4     of course, provided to Mr. Cook.  I'd offer Exhibit No. 4.

5          THE COURT:  Mr. Cook.

6          MR. COOK:  No objection, Your Honor.

7          THE COURT:  Exhibit 4 will be received.

8          MS. SVOBODA:  Thank you.

9        Your Honor, I'd call Kaleb Bruggeman to the stand.

10         THE COURT:  Mr. Cook, do you have any opening motions

11    or statements?

12         MS. SVOBODA:  Oh, I -- I apologize.

13         THE COURT:  That's okay.

14         MR. COOK:  I would just ask that the witnesses be

15    sequestered.  Other than that, Your Honor, I do not have any

16    opening statements.

17         THE COURT:  Motion to sequester's granted.

18         MS. SVOBODA:  Overstepped me on that, Mr. Cook -- I

19    overstepped my bounds there.  I apologize.

20         COURTROOM DEPUTY:  State your full name for the

21    record, please, and spell your last name.

22         THE WITNESS:  Kaleb Bruggeman, B-r-u-g-g-e-m-a-n.

23         COURTROOM DEPUTY:  (Inaudible.)

24         THE WITNESS:  K-a-l-e-b.

25          KALEB BRUGGEMAN, PLAINTIFF'S WITNESS, SWORN

```
 1                 THE COURT:  The government's witness.

 2                 MS. SVOBODA:  Thank you.

 3                            DIRECT EXAMINATION

 4    BY MS. SVOBODA:

 5    Q.   Sir, would you mind stating your name for the record.

 6    A.   Kaleb Bruggeman.

 7    Q.   You're wearing a pretty distinctive uniform, sir.  Are

 8    you employed by the Nebraska State Patrol?

 9    A.   Yes, I am.

10    Q.   In what capacity?

11    A.   I am a trooper with the Nebraska State Patrol.

12    Q.   How long have you been a trooper?

13    A.   Approximately seven years.

14    Q.   What is -- what are your duties and responsibilities as a

15    trooper?

16    A.   I am currently assigned to the traffic services division

17    which we enforce all traffic laws.  Our emphasis is on traffic

18    enforcement.  All criminal laws for the State of Nebraska and

19    all federal laws.

20    Q.   Okay.  Do you work in a certain area of the state?

21    A.   I am currently assigned to the Lincoln duty station,

22    Lincoln, Nebraska, and the surrounding area.

23    Q.   Do you conduct your duties in the uniform that you're

24    wearing and in a marked cruiser?

25    A.   Yes, I do.
```

1   Q.   Okay.  I'd like to direct your attention to January 3,

2   2008.  Were you working for the Patrol on that day or evening

3   in the capacity you've just described?

4   A.   Yes.

5   Q.   And on that day --  What was your shift of employment

6   that day?

7   A.   That day I was actually working a day shift, and I went

8   to work at 8 a.m., and I would have been off at 6 p.m. that

9   night normally.

10  Q.   Okay.  On that day did you come in contact ultimately

11  with a man named Daniel Hitchcock?

12  A.   Yes, I did.

13  Q.   He was driving a Cadillac, correct?

14  A.   Correct.

15  Q.   Trooper, did you stop Mr. Hitchcock for speeding in Otoe

16  County, Nebraska?

17  A.   Yes, I did.

18  Q.   Okay.  About what time did that stop occur?

19  A.   I believe it was around 1:52 p.m.

20  Q.   Where were you when you saw Mr. Hitchcock's Cadillac?

21  A.   When I first observed the vehicle, I was approximately

22  one mile east of Syracuse on Highway -- State Highway 2 which

23  is mile marker 488.

24  Q.   Four eight eight on the highway?

25  A.   Correct.

1    Q.    Okay.

2    A.    On Highway 2.

3    Q.    All right.  Which direction was it traveling?

4    A.    The vehicle -- I was eastbound.  The -- his vehicle was

5    westbound.

6    Q.    All right.  So you're coming toward each other, passing

7    each other that way?

8    A.    Correct.

9    Q.    Where did you stop Mr. Hitchcock's vehicle in order to

10   conduct the speeding violation?

11   A.    It was approximately one mile west of Unadilla on Highway

12   2 which is approximately five miles from where I first

13   observed the vehicle.

14   Q.    Okay.  And if I asked you this, I apologize.  About what

15   time of day did the traffic stop happen?

16   A.    Approximately 1:52 p.m.

17   Q.    Okay.  What's the weather like this day?

18   A.    It was clear and brisk, cold, approximately 20 degrees

19   area.  There was snow on the ground.

20   Q.    Okay.  Anybody else in the vehicle besides Mr. Hitchcock?

21   A.    Yes.

22   Q.    Who was that?

23   A.    Henry Tendler I believe was the last name.

24   Q.    All right.  But Mr. Hitchcock's driving, right?

25   A.    Correct.

1   Q.   Okay.  So you conduct the traffic stop by how?

2   A.   Just activating my emergency lights and stopping the

3   vehicle.

4   Q.   Okay.  And Mr. Hitchcock stopped pretty much right away,

5   no issue with that, right?

6   A.   Correct.

7   Q.   Okay.

8              THE COURT:  Miss Svoboda, if I might interrupt you

9   just for a moment.  I want to make sure we have on the

10  record -- we talked about it in a pretrial conference but not

11  on the record.

12      Mr. Cook, regarding the motion that was filed in this

13  matter, which is number 28, that motion talks about also

14  objecting to the stop based upon the government's allegation

15  of speeding, and my understanding is you want to withdraw that

16  portion of the motion.

17             MR. COOK:  That's correct, Your Honor, on the issue

18  of speeding.

19             THE COURT:  Very good.  As the reason for the stop?

20             MR. COOK:  Correct.

21             THE COURT:  I'll accept that.

22      I just wanted to make a record of that, Miss Svoboda, so

23  the record's clear.

24             MS. SVOBODA:  Thank you.

25  BY MS. SVOBODA:

1   Q.   Trooper, tell me how you approached the vehicle.

2   A.   I approached the vehicle on the driver's side making

3   contact at the driver's side window.

4   Q.   What, if anything, about the vehicle -- interior of the

5   vehicle do you observe as you make your contact?

6   A.   As I'm approaching the vehicle, I observed a subject

7   laying down in the back seat.  I observed it -- what it

8   appeared to me was he was pretending to be asleep.

9   Q.   Now, this person lying down was ultimately identified as

10  Mr. Tendler, correct?

11  A.   Correct.

12  Q.   When you say "pretending to be asleep," what did you see?

13  A.   He was slightly opening his eyes, and when I looked in

14  his direction, he quickly would close them.  He did that more

15  than once while --

16  Q.   Okay.

17  A.   -- while I was up at the vehicle.

18  Q.   What, if anything, did you say upon your approach to the

19  vehicle?

20  A.   I advised the driver of the reason for stop right away

21  and asked him to produce his information, driver's license,

22  registration, insurance, that information.

23  Q.   Did he provide those things to you, Trooper?

24  A.   He provided me with his driver's license and a rental

25  agreement.

1    Q.   Okay.  What happened next?

2    A.   I had a short conversation about the reason for the stop.

3    Q.   What'd you say in that regard?

4    A.   I just advised him that the reason I'm stopping him was I

5    had him speeding and I advised him how fast I had him going.

6    Q.   Okay.  What happened next?

7    A.   At that point I asked for his passenger's identification

8    and he produced a Georgia driver's license.

9    Q.   Mr. Tendler did?

10   A.   Yes.

11   Q.   All right.  What happened next?

12   A.   I asked --  I also observed some other paperwork setting

13   on the front seat of the vehicle.

14   Q.   What was that?

15   A.   There was a MapQuest actual map setting on the

16   passenger's seat and I could see the balloon or blip on it

17   where it said end which was in northern California.

18   Q.   Was that significant to you?

19   A.   Not at the time it was not.

20   Q.   Okay.  Any other observations did you -- did you make any

21   other observations about the car while you're up there at this

22   initial contact?

23   A.   I did -- did detect an odor coming from the vehicle.

24   Q.   What was that?

25   A.   I detected the strong odor of raw marijuana coming from

1    the vehicle.

2    Q.   Trooper, how is it that you're familiar with the odor

3    of -- with the smell of raw marijuana?

4    A.   Through training and through my job every day making

5    traffic stops and dealing with subjects that had -- in

6    possession of marijuana.

7    Q.   Can you estimate for me on a monthly or a weekly basis

8    how often you come in contact with what you believe to be the

9    odor of raw marijuana?

10   A.   Probably a safe estimate would be a couple times -- two

11   to three times a week.

12   Q.   Okay.  What happened next?

13   A.   At that point I asked Mr. Hitchcock to step back to my

14   patrol unit.

15   Q.   And did he do so?

16   A.   Yes, he did.

17   Q.   And, again, just so -- just so we're clear on this, no

18   incident with that?  He didn't try to not come back to your

19   car or anything like that?

20   A.   Correct.  He cooperated and came back to my patrol unit.

21   Q.   All right, great.  What happened next?

22   A.   I had him take a seat in my patrol unit and, again, at

23   that point I could detect the odor of raw marijuana coming

24   from his person.

25   Q.   Okay.  Did you ask him about that?

1    A.   Not yet.  Not at that point I did not.

2    Q.   All right.  So what -- what happens when the two of you

3    are in your cruiser?

4    A.   I contact my dispatch in Lincoln.  I first tried on my

5    radio but was unsuccessful, so I called them on my cell phone.

6    Q.   What's the purpose of contacting dispatch?

7    A.   I was contacting dispatch first to advise them that I was

8    on a traffic stop --

9    Q.   Okay.

10   A.   -- and also I advised them --  I used ten-codes is what

11   we use.  I advised them that I needed 10-89 which is a

12   ten-code for I need assistance and that I believed that I had

13   10-40 which is a drug violation.

14   Q.   All right.  What happened next?

15   A.   I then asked my dispatch to run the subjects to check if

16   they had valid licenses, any wants, warrants out on their

17   person, and I also asked them to run criminal histories on

18   them.

19   Q.   What happened next?

20   A.   I --  My dispatch advised -- came back and advised me

21   that they had valid licenses, no warrants, but both subjects

22   did have lengthy criminal histories.

23   Q.   All right.  Now, in the time you call the dispatch and

24   you receive that response --  I should have said it this way:

25   Did you get that response from your dispatch immediately or

1    did it take a little time?

2    A.   A little time, but probably less than five minutes.

3    Q.   Okay.  So what'd you do in those five minutes?

4    A.   I spoke with Mr. Hitchcock.

5    Q.   What'd you talk about?

6    A.   I just --  General questions about his trip, where he was

7    coming from, where he was going to.  I believe I asked him

8    what he did for a living.  I also asked him about any criminal

9    history he may have as far as if he'd ever been arrested for

10   anything.

11   Q.   What'd he say in that regard?

12   A.   He denied ever being arrested.  I believe he admitted to

13   traffic violations.

14   Q.   Okay.  Anything about his travel itinerary cause you any

15   concern?

16   A.   Yes.

17   Q.   What?

18   A.   When I asked him where he was going to, he started to say

19   St. Louis but then quickly changed his response to Salt Lake

20   City, Utah.

21   Q.   Why was that significant to you?

22   A.   I had noticed in the front seat that he had a MapQuest

23   map showing he was going to northern California, so I found

24   that odd.

25   Q.   Anything else, sir?

1    A.   During my conversation with him, he appeared very

2    nervous.   When I say nervous, his legs were noticeably shaking

3    and he was noticeably sweating, and I should note that he was

4    wearing shorts and a T-shirt --

5    Q.   Okay.

6    A.   -- and it was a cold winter day.

7    Q.   Sir, you obviously -- as you said you were in uniform on

8    this day and you're -- and Mr. Hitchcock is sitting right next

9    to you in a cruiser.  I assume you have a gun on your hip.

10   A.   Correct.

11   Q.   You come into situations like that often.  You have

12   people in your car when you effectuate a traffic stop, right?

13   A.   Yes.

14   Q.   Trooper, isn't everybody nervous when they're sitting in

15   your cruiser?

16   A.   Yes.  That'd be a fair statement that most people are

17   nervous.

18   Q.   Is --  On this day is Mr. Hitchcock more nervous than you

19   normally encounter?

20   A.   Yes.

21   Q.   Okay.  Any other observations during this five minutes

22   approximately while you're waiting for dispatch that your

23   conversation with Mr. Hitchcock caused you some concern?

24   A.   He was --  I -- I guess when I asked him about his trip

25   and he was able to provide a name of the friend he was going

1    to see.  He was very vague at first that -- just a first name.

2    He was able to produce a last name after being asked, and at

3    the time he told me about his work situation which raised my

4    interest too as far as being able to afford to drive across

5    country the way he was, renting a vehicle.

6    Q.   What'd you mean by that?

7    A.   Well, it's not cheap to rent a vehicle, and he said he

8    was -- his -- as far as his -- as I recall, his job was he was

9    a door-to-door jewelry salesman --

10   Q.   Uh-huh.

11   A.   -- and his response as far as how much money he was

12   making, it was less than I believe $5,000 in the last year.

13   Q.   Okay.  Was the Cadillac a rented vehicle?

14   A.   Yes, it was.

15   Q.   After you received the information that you testified

16   about from your dispatch, what happened next?

17   A.   At that point, I -- I waited -- well, during that

18   situation -- as I was waiting, a Otoe County Deputy Sheriff

19   showed up at the scene and I did contact him and tell him what

20   was going on with the stop.

21   Q.   Okay.  What happened next?

22   A.   I then issued Mr. Hitchcock his citation for speeding.

23   Q.   All right.  Is a citation a ticket?

24   A.   Yes, it is.

25   Q.   Okay.  Did --  What did he say upon receiving the

1    citation, if anything?

2    A.   When I told him -- you know, I believe my words were

3    something to the effect that he was going way too fast --

4    Q.   Okay.

5    A.   -- and he said -- his exact words were I know.

6    Q.   All right.  So you gave him the ticket.  Did you return

7    the paperwork to him?

8    A.   Yes, I did.

9    Q.   Oh, one thing.  Prior to doing that, issuing the ticket,

10   did you ever go up and talk to Mr. Tendler at the vehicle?

11   A.   Yes, I did.

12   Q.   When did you do that?

13   A.   It was before issuing the citation I went and made

14   contact with him.  It was after finding out from my dispatch

15   that there was no wants, warrants, suspended licenses on the

16   subjects.

17   Q.   All right.  Tell me about your conversation with

18   Mr. Tendler.

19   A.   It was just a brief conversation.  I asked where they

20   were headed to, what they were going for, and I asked him if

21   he'd ever been arrested for anything as I recall.

22   Q.   What did he say about him being arrested?

23   A.   I believe he denied it also that he had any criminal

24   history -- or significant criminal history.

25   Q.   Did his travel itinerary story differ from

1    Mr. Hitchcock's?

2    A.   No.  They were pretty much the same.

3    Q.   Okay.  Now I'm back to the point where you issue the

4    citation or give the ticket to Mr. Hitchcock.  Did you return

5    your -- all of his paperwork back to him also?

6    A.   Yes, I did.

7    Q.   How did you end the traffic stop?

8    A.   I handed him all of his paperwork back and I believe I

9    actually advised him that he was -- he was free to go.

10   Q.   What happened next?

11   A.   As he opened his door, I asked him if I could ask him a

12   few more questions.

13   Q.   What was his reply?

14   A.   He advised in the affirmative yes, I believe, or

15   something to that effect.

16   Q.   What happened next?

17   A.   I then confronted him about the odor of marijuana coming

18   from his vehicle and person.

19   Q.   How'd you do that?

20   A.   I just -- I believe I told him something to the effect

21   that I was going to be straightforward with him --

22   Q.   Okay.

23   A.   -- and I asked him about marijuana coming from the

24   vehicle and his person, and I asked him if I could search his

25   vehicle.

1    Q.   When you say that you -- Well, strike that.  What, if

2    anything, did he say in response to your request?

3    A.   He denied any knowledge of any odor of marijuana coming

4    from him or his vehicle and he advised that he did not want me

5    to search his vehicle 'cause he was in a hurry.

6    Q.   Okay.  What happened next?

7    A.   At that point, I advised him that the fact that I was

8    smelling the odor of marijuana coming from his vehicle gave me

9    a probable cause to search his vehicle.

10   Q.   Did he say anything in response to that?

11   A.   I don't believe he had any response.  He may have said he

12   was in a hurry, something to that effect, but no -- he didn't

13   challenge me on it.

14   Q.   Okay.  Good way to say it.  So then what happened?

15   A.   I asked Mr. Tendler to step back to -- had him take a

16   seat in the back seat of my patrol unit.

17   Q.   And did he do that?

18   A.   Yes, he did.

19   Q.   And, again, that happened without any kind of incident,

20   correct?

21   A.   Correct.

22   Q.   What'd you do next?

23   A.   I then began a search of the vehicle.

24   Q.   Now, where's the Otoe County Sheriff's Deputy -- his name

25   was Mike Holland, correct?

1    A.    Correct.

2    Q.    Where's Deputy Holland as you begin the search for {sic}

3    your {sic} vehicle?

4    A.    He was standing between my vehicle and the Cadillac.

5    Q.    Okay.  He's more of a security position, correct?

6    A.    Correct.

7    Q.    Now, are -- is Mr. -- so Mr. Hitchcock is in the front

8    seat of your vehicle and Mr. Tendler's in the back seat,

9    correct?

10   A.    Correct.

11   Q.    Are either of them restrained?

12   A.    No.  Well, Mr. Tendler was in a cage, so he could not get

13   out by himself, but he -- nobody was in handcuffs.

14   Q.    Okay.  Where do you start the search of the vehicle?

15   A.    I believe I started at the front of the vehicle, driver's

16   and passenger's side.

17   Q.    Did you find anything of significance to you there?

18   A.    Some paperwork that was -- the rest of that MapQuest

19   report showing that they were going to a place in northern

20   California.  There was actual directions, text directions, on

21   how to get there, and --

22   Q.    Text?

23   A.    In text I guess I should say.

24   Q.    Okay.

25   A.    Writing.

 1    Q.    Okay.

 2    A.    And then there was numerous paperwork scattered

 3    throughout the vehicle.  I did recover a citation that they'd

 4    been issued earlier that morning in Kentucky, and as I recall,

 5    there was a air freshener spray bottle in the back seat of the

 6    vehicle.

 7    Q.    Did you smell any of the air -- anything like air

 8    freshener when you're conducting your search of the inside of

 9    the vehicle?

10    A.    Inside the vehicle I don't recall smelling air freshener,

11    no.

12    Q.    When you're inside the vehicle doing the search, do you

13    still smell the odor of raw marijuana?

14    A.    Yes.

15    Q.    What happens next?

16    A.    I --  After searching the interior of the vehicle, I

17    proceed to the trunk of the vehicle.

18    Q.    Okay.  You open the trunk.  What'd you see?

19    A.    A couple suitcase -- there were, I believe, two or three

20    suitcases in the trunk of the vehicle.

21    Q.    What happened next?

22    A.    I opened one of the suitcases and immediately observed a

23    Glock 23 handgun.

24    Q.    Which -- which suitcase was this in?

25    A.    It was a black suitcase.  I later was able to identify

1   the owner of the suitcase.

2   Q.   The --   There was a black suitcase in the trunk and the

3   other suitcase was red, correct?

4   A.   Correct.

5   Q.   After you found the gun, what'd you do?

6   A.   At that time --   I had already been advised by my

7   dispatch -- my dispatch advised me that both subjects were

8   convicted felons --

9   Q.   Okay.

10  A.   -- so they were both placed in handcuffs at that point.

11  Q.   What happened next?

12  A.   I then continued to search the vehicle.   Inside that same

13  suitcase I located a Food Saver I believe was the brand name.

14  What I would call a shrink-wrap machine or food -- food

15  processor machine.

16  Q.   Okay.   That's in the -- that's in the same suitcase with

17  the gun?

18  A.   Yes.

19  Q.   Okay.   What happens next?

20  A.   I continue my search and inside the driver's side trunk

21  wall I pulled the carpet back and located a shrink-wrapped

22  bundle of U.S. currency.

23  Q.   Ultimately, sir, that is the currency at issue in this

24  case, correct?

25  A.   Correct.

1    Q.    Thirty-five thousand dollars?

2    A.    Correct.

3    Q.    Okay.  Upon finding that, what'd you do?

4    A.    At that time I pretty much -- once I located that

5    currency, I stepped back from the search and contacted a

6    supervisor with the Nebraska State Patrol and I also contacted

7    another officer with the Nebraska State Patrol.

8    Q.    Okay.  Just to let them know of what you found and that

9    kind of thing?

10   A.    Correct.

11   Q.    Did you continue to search the car there at that point?

12   A.    No.  Well, there was a little bit more search done, but

13   the remainder of it was done after the vehicle was moved to

14   the Otoe County Sheriff's Office.

15   Q.    Okay.  And at the Otoe County Sheriff's Office, was

16   anything else found in the vehicle that was significant to you

17   or other law enforcement officers?

18   A.    Other than just more paperwork that we were able to go

19   through.  There was no other significant things that I recall.

20   Q.    But was the paperwork that was found significant to you?

21   A.    Yes.

22   Q.    In what way?

23   A.    It just --  The paperwork -- a lot -- it showed the

24   pattern of their -- where they'd been, where they were coming

25   from and their trip.

1    Q.   Where had they been?

2    A.   Well, the -- they were coming from Atlanta, Georgia, and

3    I -- one significant thing I did notice with the paperwork was

4    Mr. Tendler's driver's license.

5    Q.   Why was that significant to you?

6    A.   It had been issued the day before in Atlanta, Georgia,

7    and he was actually wearing the same clothing in the picture

8    that he was wearing when I stopped him.

9    Q.   Why was that significant to you?

10   A.   Just --  It -- it also showed that they'd been driving

11   pretty much nonstop from when they left Atlanta, Georgia.

12   Q.   Okay.  Why was that significant to you?

13   A.   Normal -- normally, people don't drive, you know, 24

14   hours --

15         MR. COOK:  I'm going to --

16   A.   -- straight.

17         MR. COOK:  -- I'm going to object now as to lack of

18   foundation.  I'm going to also object as to relevance and --

19   and how does the officer know what's normal, I guess, and the

20   significance, Your Honor.

21         THE COURT:  I'll sustain it on foundation.

22   BY MS. SVOBODA:

23   Q.   Generally, after you -- you've testified that after you

24   find the money, your dealings with Mr. Hitchcock kind of takes

25   a -- kind of take a different turn at that point, correct?

1   A.   Correct.

2   Q.   Okay.  So, ultimately, Mr. Hitchcock and Mr. Tendler

3   would have been taken to some State Patrol office or

4   something?

5   A.   They were actually transported to the Otoe County

6   Sheriff's Office in this case.

7   Q.   Okay.  Who transported them, do you know?

8   A.   One of the subjects was transported by Deputy Holland.

9   Mr. Tendler was transported by Mr. -- Deputy Holland --

10  Q.   Okay.

11  A.   -- and I transported Mr. Hitchcock.

12  Q.   During the transport you driving Mr. Hitchcock, did you

13  say anything to him?

14  A.   No.  No.  There was no conversation at all.

15  Q.   Okay.  At --  Once you get -- once you get to the Otoe

16  County Sheriff's Office, what, if anything, did you do with

17  Mr. Hitchcock?

18  A.   At that point, they were taken into the Otoe County

19  Sheriff's Office -- actually, the Otoe County jail, and at

20  which time I actually got a copy of their criminal history --

21  Q.   Okay.

22  A.   -- and after looking at their criminal history, I

23  verified that actually they were not convicted felons, neither

24  one of them had actually been convicted of a felony.

25  Q.   All right.

 1    A.   At that point, they were just placed in holding until

 2    Sergeant Kallhoff with the Nebraska State Patrol could speak

 3    with them.

 4    Q.   Okay.  And, ultimately, that did happen too, correct?

 5    A.   Correct.

 6    Q.   Okay.  So --  But any of the other time -- any of the

 7    time that Mr. Holland -- I'm sorry, Mr. Hitchcock was at the

 8    Otoe County Sheriff's Office did you speak to him directly?

 9    A.   Not other than him -- maybe just general -- I may have

10    had a short conversation, but it would have just been general

11    talking.  It was no questioning.

12    Q.   Well, then what kind of conversation did you have with

13    him?

14    A.   Just about what was going on.  We never -- I never

15    discussed with him what I found in the vehicle, though, but

16    he -- I do know he made conversation wanting to know what was

17    going on, and I advised him, I believe, that there would be an

18    officer that would speak with him.

19    Q.   Okay.  Okay.

20         MS. SVOBODA:  May I have just a second, please,

21    Judge?

22         THE COURT:  You may.

23         MS. SVOBODA:  Thank you.  Thank you, Judge.  Judge, I

24    have no other questions for the trooper, but having said that,

25    if I may just ask the Court one question.  Judge, may I take

1    one minute to call the next witness that I would intend to

2    call 'cause they're about 15 minutes away, Judge, which would

3    just make sure that he's here right when --

4               THE COURT:  Sure.

5               MS. SVOBODA:  Okay.  Thank you.  Judge, thank you for

6    the time.

7               THE COURT:  Uh-huh.  Mr. Cook.

8               MR. COOK:  Sure, Your Honor.  Judge, we may want to

9    approach to discuss something with you.

10              THE COURT:  Sure.

11              MR. COOK:  And I apologize for not standing.  I don't

12   know what I'm thinking.  It ties in with what we discussed

13   earlier, Judge.

14        (Bench discussion had off the record.)

15              MR. COOK:  Would you like me to have this marked

16   then, Your Honor?

17              COURTROOM DEPUTY:  (Inaudible.)

18              THE COURT:  Yes, you may.

19              MR. COOK:  I apologize.

20        I would like to have that marked as Exhibit 109.  And I

21   would like to have that marked as Exhibits {sic} 110.

22        Thank you, Your Honor.  May I approach the witness, Your

23   Honor?

24              THE COURT:  You may.

25

1                        CROSS-EXAMINATION

2    BY MR. COOK:

3    Q.   Trooper Bruggeman, I've just handed you what's marked as

4    Defendant's Exhibit 109; is that correct?

5    A.   Yes.

6    Q.   Do you recognize that particular document?

7    A.   Yes.

8    Q.   What is it?

9    A.   It appears to be a photocopy of the citation I spoke of

10   that was located in the vehicle that was issued by another

11   agency.  I believe it was in Kentucky.

12   Q.   Okay.  It was in Christian County, Kentucky, correct?

13   A.   Correct.

14   Q.   Does that appear to be a true and correct copy of the

15   actual document that you did discover in the vehicle driven by

16   Mr. Hitchcock on June 3rd -- or on January 3rd, 2008?

17   A.   Yes.

18            MR. COOK:  I would offer what's marked as Exhibit 109

19   of the defendant.

20            THE COURT:  109.  Miss Svoboda?

21            MS. SVOBODA:  Relevance -- objection on relevance,

22   Judge.

23            THE COURT:  Overruled.  109 will be received.

24            MS. SVOBODA:  Okay.

25   BY MR. COOK:

1    Q.   Does it indicate what time of day, Officer Bruggeman,

2    that this vehicle -- well, rather -- strike that.  Does it

3    indicate what type of vehicle was stopped on that citation?

4    A.   Yes, it does.

5    Q.   And is that the same vehicle that you stopped with

6    Mr. Hitchcock in it on January 3rd, 2008, in Otoe County,

7    Nebraska?

8    A.   Yes.

9    Q.   Okay.  And what time of the day -- what date and time

10   does that citation indicate this vehicle was stopped

11   previously?

12   A.   January -- January 3rd, 2008, at 4:32 a.m.

13   Q.   Okay.  Does it indicate who was driving the vehicle?

14   A.   It has the defendant which I would assume was driving the

15   vehicle -- or -- not this defendant.  It has the person who

16   was cited who I assume was driving the vehicle.

17   Q.   Okay.  And who was that?

18   A.   Henry Tendler.

19   Q.   Okay.  And you indicated on prior testimony that

20   Mr. Tendler was found in the car at the time of the stop as

21   well, correct?

22   A.   Correct.

23   Q.   And through conversations it was also indicated to you

24   that they were traveling together, correct?

25   A.   Correct.

1    Q.   Okay.  Now I'm going to fast-forward, Trooper, to the

2    actual stop itself of Mr. Hitchcock.  At the time of the stop,

3    did he have any issues with finding his driver's license or

4    any of the information regarding the vehicle?

5    A.   He was able to produce everything adequately.

6    Q.   Okay.  And he had validly rented this vehicle, correct?

7    A.   Correct.

8    Q.   And there weren't any issues with his driver's license,

9    correct?

10   A.   Correct.

11   Q.   At the --  You'd indicated you initially smelled raw

12   marijuana upon the stop, correct?

13   A.   Correct.

14   Q.   Now, was this as soon as he rolled down the window or --

15   Describe to me the first point at which you smelled raw

16   marijuana.

17   A.   Right when I got -- right when I got up to that vehicle

18   to that driver's door and the window was down, I detected the

19   odor of raw marijuana.

20   Q.   Okay.  I don't know if there's a raw marijuana scale for

21   smell, but how strong in your opinion was the smell?

22   A.   I believe I noted it as strong.  I usually when --  My

23   only scale I can do is when I'm arresting a driving under the

24   influence person, I use a scale of how strong the odor of

25   alcohol is, and I usually go slight, moderate to strong.

1    Q.   Okay.  And in your opinion, there was a strong odor of

2    raw marijuana then, correct?

3    A.   Correct.

4    Q.   And you noticed this as soon as the window was rolled

5    down when you walked up to the passenger side; is that

6    correct?

7    A.   Correct.

8    Q.   Or, rather, the driver's side?

9    A.   Correct.

10   Q.   Did you indicate at any point in time to Mr. Hitchcock

11   the amount of marijuana that you estimated to be in the car?

12   A.   I don't believe so, no.

13   Q.   Did you make mention of the smell of marijuana thinking

14   back -- looking back on this when you initially walked up to

15   the driver's side?

16   A.   No, I don't believe so.  I --  When I was up at the

17   vehicle, I did not mention it to Mr. Hitchcock.

18   Q.   Okay.  Is there any reason as to why you didn't mention

19   the smell of raw marijuana immediately?

20   A.   My --  Normally, when I -- when I smell marijuana coming

21   from a vehicle and there's more than one person in that

22   vehicle, I normally don't mention it to them when I'm up

23   there.  I usually bring the person back and talk to them.  I

24   can explain further if you'd like.

25   Q.   Okay.  Did you find any raw marijuana in that vehicle?

 1   A.   No, I did not.

 2   Q.   Did you find any burnt marijuana in that vehicle?

 3   A.   No, I did not.

 4   Q.   Did you find any paraphernalia in that vehicle?

 5   A.   No, I did not.

 6   Q.   Have you ever had occasion in the past to smell raw

 7   marijuana but not find anything in the vehicle?

 8   A.   Yes.

 9   Q.   Once you smelled that smell of raw marijuana, did you

10   make up your mind at that point in time that you were going to

11   search the vehicle?

12   A.   Yes.

13   Q.   So at that point in time, Mr. Hitchcock would not have

14   been free to leave, correct?

15   A.   Correct.

16   Q.   You had also indicated on direct that you noticed a

17   MapQuest map or a couple MapQuest maps in the car; is that

18   correct?

19   A.   Correct.

20   Q.   Was there more than this one MapQuest map that had a

21   destination of northern California?

22   A.   I believe that there was two actual printout maps, one

23   was bigger than the other, that I located during the search,

24   but I believe that it was the same location in northern

25   California, but I don't recall if it was the exact same but

1    same area.

2    Q.   Did one of those maps happen to have a beginning location

3    of Reno, Nevada?

4    A.   They may have.  I don't recall, but they may have.

5    Q.   Okay.  You'd also testified that the two individuals',

6    Mr. Tendler and Mr. Hitchcock's, stories all in all matched up

7    fairly well, correct?

8    A.   Correct.

9    Q.   Is it also possible --  Well, strike that.  You'd also

10   testified on direct that Mr. Hitchcock informed you he was

11   headed to Salt Lake City, Utah; is that correct?

12   A.   Correct.

13   Q.   Is it possible that he told you he was headed to Lake

14   Tahoe?

15   A.   No.  He advised Salt Lake City, Utah.

16   Q.   Did you notice any other maps or atlases in the car other

17   than those printouts?

18   A.   There may have been another --  I don't -- I didn't

19   notice one, no.

20   Q.   Okay.  During your communications with Mr. Hitchcock, was

21   he forthcoming with information on the trip, what their plans

22   were, et cetera?

23   A.   Yes.  He answered all my questions.

24   Q.   You'd also testified that he indicated he was traveling

25   to St. Louis initially when you asked him where he was going

1    and then changed it to Salt Lake; is that correct?

2    A.   Correct.

3    Q.   And, additionally, you indicated he was coming from

4    Atlanta; is that correct?

5    A.   Correct.

6    Q.   Is it possible that he confused that he had went through

7    St. Louis on his way to where he was currently?

8    A.   Yeah, that's possible.

9    Q.   Do you ever find that when people are nervous and you're

10   asking them questions, sometimes they may mix up their answers

11   when they're providing them to you?

12   A.   Correct.

13   Q.   Is it also possible that he may have had multiple

14   destinations that he was going to?

15   A.   It's possible, yes.

16   Q.   You'd indicated that he testified to you that he did some

17   selling of jewelry; is that correct?

18   A.   I -- yes.

19   Q.   Did he specify?  Did he say watches?  Did he tell you

20   anything in particular?

21   A.   I don't -- I --  He may have said watches now that you

22   say that, but I don't recall him being very specific on it.

23   Q.   Did he tell you that that was his sole and only means of

24   income?

25   A.   No.

1    Q.   You also indicated that when you addressed the issue of

2    speeding that he advised you that he knew he was speeding; is

3    that correct?

4    A.   Yes.

5    Q.   And from the citation we know -- from the prior citation

6    in Kentucky, one would assume that he at least knew he was

7    speeding on two other occasions as well, correct?

8    A.   Well, he wasn't driving during that other citation, so I

9    can't speak to what he did or did not know.

10   Q.   Fair enough.  But you can tell from that that they had

11   sped at least more than one time during this trip, correct?

12   A.   It appears so, yes.

13   Q.   On your testimony, you indicated that Mr. Hitchcock and

14   Mr. Tender were handcuffed prior to the search of the car,

15   correct?

16   A.   No.

17   Q.   Let me rephrase that then.  Were they handcuffed prior to

18   the search of the car?

19   A.   No.

20   Q.   Were they free to leave prior to the search of the car?

21   A.   No.

22   Q.   They were handcuffed, though, however, once you found the

23   weapon in the car, correct?

24   A.   Correct.

25   Q.   What was your basis for handcuffing them upon finding the

1   weapon in the car?

2   A.    The fact that there was a firearm in the vehicle and at

3   the time I had been advised twice by my dispatch that they

4   were both convicted felons.  At that point for my safety and

5   the fact that one of them would have been in possession -- a

6   felon in possession of a firearm, I placed both in handcuffs.

7   Q.    Did you arrest either one of them prior to leaving the

8   scene for being in possession of a firearm and being a felon?

9   A.    My belief was -- I don't --  I believe I did advise them

10  that -- that they were -- there was a firearm in the vehicle

11  and that they were both convicted felons.  I don't recall

12  actually telling them that they were under arrest for that.

13  Q.    Did you Mirandize either Mr. Hitchcock or Mr. Tendler at

14  the point of the search or after the search?

15  A.    No, I did not.

16  Q.    Did you at any point in time ever acquire information

17  that the handgun that you just testified about was illegal or

18  there was anything illegal regarding that handgun being in

19  these individuals' possession?

20  A.    At the time of the stop or -- I guess...

21  Q.    At the time of the stop.

22  A.    At the time of the stop, my belief was that they were

23  both convicted felons, so that they would have been in

24  possession -- felon in possession of a firearm.

25  Q.    Although you didn't arrest either one for that charge at

1    that point in time, correct?

2    A.   Correct.

3    Q.   At the time of the search, did you determine whose

4    handbag was whose?

5    A.   Not until after I had located that firearm.  That's when

6    I asked -- asked whose bag belonged to who.

7    Q.   And -- and just to clarify the record, your testimony

8    would be that this search was predicated upon your smell of

9    the raw marijuana only, correct?

10   A.   Correct.

11   Q.   Now, once Mr. Tendler and Mr. Hitchcock were taken to the

12   Otoe County Sheriff's Office, they were held there while you

13   further investigated, correct?

14   A.   Correct.

15   Q.   Were they inventoried at that particular point in time?

16   A.   Their persons?

17   Q.   Correct.

18   A.   Yes.

19   Q.   Were they told to dress out in inmate's clothing?

20   A.   I believe the sheriff's office did do that, yes.

21   Q.   And they were held there and were not free to leave,

22   correct?

23   A.   Correct.

24   Q.   Were they in shackles or handcuffs at that point?

25   A.   Once they were changed out, no, they were not.

1   Q.   Okay.  Do you know if they were strip-searched?

2   A.   I don't know.

3   Q.   You don't know or no?

4   A.   I don't know.

5   Q.   Were you part of any interrogation at all once you left

6   the scene of the stop and search?

7   A.   No, I was not.

8   Q.   Were you involved at all in the search of Mr. Hitchcock's

9   person or the vehicle he was driving once both arrived at the

10  Otoe County Sheriff's Office?

11  A.   No, I was not.

12  Q.   Is there anything illegal with simply transporting cash?

13  A.   Just cash?  Not that I'm aware of.

14        MR. COOK:  Can I have one second, Your Honor --

15        THE COURT:  You may.

16        MR. COOK:  -- to look over my notes?

17  BY MR. COOK:

18  Q.   Off- -- Trooper, sorry, how much time elapsed between the

19  point at which you turned on your -- well, strike that.  Did

20  you turn on your overhead lights to pull over Mr. Hitchcock?

21  A.   Yes, I did.

22  Q.   Did you turn on your siren?

23  A.   I don't believe so.

24  Q.   Okay.  From the point at which you initiated the stop to

25  when Mr. Hitchcock pulled over, what would be your estimation

1    as to the amount of time that passed?

2              MS. SVOBODA:  Objection, relevance.

3              THE COURT:  Overruled.  He may answer the question.

4    A.   Fifteen to thirty seconds is an estimate.

5    BY MR. COOK:

6    Q.   Was the air freshener in the car within the personal

7    space of Mr. Hitchcock?

8    A.   I suppose he could have reached it.  It would have been

9    within his reach, lunge or grasp.

10   Q.   There's been a video offered into evidence today.  I --

11   That's from your cruiser.  Are you -- are you aware of that?

12   A.   Yes.

13   Q.   Are you aware of the fact that at points in this video

14   the audio is not available?

15   A.   The audio on my person at times is not available, but the

16   audio in the vehicle is always on.

17   Q.   Okay.  What is the reason that the audio on your person

18   is not available at times?

19   A.   When the -- At the points I turned that off was when

20   Mr. Hitchcock and Tendler were setting in the vehicle, and at

21   that point Deputy Holland was there who also had video, so our

22   audio would have been on his video, if that makes sense.

23   Q.   So you did not want to record any conversation between

24   you and Mr. Holland; is that correct?

25   A.   No, that is not correct.

1    Q.   So what was the purpose then of turning off your audio?

2    A.   I turned off my audio 'cause both subjects were in my

3    patrol unit, and when you have both -- the cameras we have you

4    can record the auto {sic} inside your vehicle and outside at

5    the same time, but they will run over top of each other at

6    times, and I was more concerned with having that in-vehicle

7    audio.

8         And plus once Deputy Holland shows up at the scene, he --

9    his vehicle's also equipped with a camera, so our

10   conversations would have been captured on his camera, so none

11   of our conversation was not -- our -- our conversation was

12   recorded the whole time on one of the two videos.

13   Q.   Do you know if there was any audio recorded in the cars

14   between Mr. Hitchcock and Mr. Tendler?

15   A.   Yes, I do know.

16   Q.   Was there anything spoken between the two?

17   A.   Yes, there was.

18             MR. COOK:  May I approach, Your Honor?

19             THE COURT:  Sure.

20        Miss Svoboda.

21             MS. SVOBODA:  Oh, I'm sorry.  I apologize.

22             MR. COOK:  That's all right.

23        (Bench discussion had off the record.)

24   BY MR. COOK:

25   Q.   Sorry about the delay there.  I have a question for you

1    now.  What makes you believe that there was audio on Deputy

2    Holland's cruiser?

3    A.   My belief that there was is just my experience with the

4    Otoe County Sheriff's Office that their cars are equipped with

5    cameras, and the car he was driving's equipped with a camera,

6    and they have an audio recorder just like we have.

7    Q.   Okay.  Did you have a chance to ever listen to -- or,

8    rather, strike that.  Did you ever have a chance to observe

9    the video of Deputy Holland's car?

10   A.   No.

11   Q.   And I should rephrase that.  From this particular stop.

12   A.   Correct.  No, I have not.

13           MR. COOK:  Can I have just a second to reflect here,

14   Judge?

15           THE COURT:  Uh-huh.

16           MR. COOK:  Thank you.

17   BY MR. COOK:

18   Q.   Did you, Trooper, ever prior to shutting off the audio on

19   your person ask Deputy Holland, if he, in fact, did have his

20   audio on or was recording?

21   A.   No, I did not.

22   Q.   Is there any particular standing operating procedure with

23   the Nebraska State Patrol to your knowledge that has any

24   particular protocol as to how to record audio or video during

25   an investigation?

1    A.   Our policy states that anytime we have contact with a

2    person the audio has to be on in some form whereas leaving my

3    in-car one on when the person is in the vehicle would meet

4    that policy because anytime I'm contacting them they're in the

5    vehicle, so you're going to be able to hear my conversation

6    with them.

7    Q.   This is going to seem kind of off the wall, I guess, but

8    do you have any idea what the weather was like in Atlanta,

9    Georgia, on January 2nd?

10   A.   No idea.

11   Q.   But you had testified that from your documentation it

12   appeared as though Mr. Hitchcock had traveled from Atlanta,

13   Georgia, prior to your stop of his vehicle, correct?

14   A.   Correct.

15   Q.   Did that have anything to do with the clothing he was

16   wearing at the time?

17   A.   I don't know.

18   Q.   Is it possible that some of his shaking that you

19   testified to could have had to do with the fact he was maybe

20   cold?

21   A.   Inside my patrol unit?  I doubt it, but I guess

22   anything's possible.

23   Q.   Do you have any idea how many times you asked to search

24   Mr. Hitchcock's vehicle?

25   A.   I believe once, maybe twice at the most.

1    Q.   Okay.  But he said no every time you asked, correct?

2    A.   Correct.  He denied consent.

3         MR. COOK:  I have no further questions.

4         THE COURT:  Miss Svoboda.

5                      REDIRECT EXAMINATION

6    BY MS. SVOBODA:

7    Q.   Trooper, in whose bag was the firearm found?

8    A.   Mr. Tendler's.

9    Q.   And the --  So that was the black bag, right?

10   A.   Correct.

11   Q.   The red bag, you determined that belonged to whom?

12   A.   Mr. Hitchcock.

13   Q.   And it was Mr. Hitchcock that rented the vehicle,

14   correct?

15   A.   Correct.

16   Q.   Sir, was either Mr. Tendler or Mr. Hitchcock ultimately

17   determined to be a felon?

18   A.   Neither one were determined to be a felon.

19   Q.   Great.  That's what I wanted to clear up.  Okay.  And

20   then why would you not tell all the occupants of a vehicle

21   about a marijuana smell?

22   A.   Simply because I can't bring both subjects back with me.

23   If I mention it while I'm up there and leave somebody in that

24   vehicle, that gives them the opportunity to do something if

25   there is marijuana in the vehicle whether it's hide it, eat

 1    it, destroy it, do something to try to get rid of it.

 2    Q.   Okay.  Thank you.

 3         MS. SVOBODA:  Judge, I have no other questions for

 4    the trooper.

 5         THE COURT:  Mr. Cook?

 6         MR. COOK:  No -- no further questions, Your Honor.

 7         THE COURT:  Why isn't the weapon in the suitcase a

 8    concealed weapon, Trooper?

 9         THE WITNESS:  It could -- it could be.  Since it was

10    in the trunk of the vehicle, I chose not to.  Upon reflecting

11    and watching the video, they could have accessed it from the

12    vehicle -- the rear seat, so I think you probably could have

13    cited the rear seat passenger for being in possession of a

14    concealed weapon; however, since it was in the trunk, I didn't

15    feel at the time that that was appropriate.

16         THE COURT:  Miss Svoboda?

17         MS. SVOBODA:  Nothing, Your Honor.

18         THE COURT:  Mr. Cook.

19                         RECROSS-EXAMINATION

20    BY MR. COOK:

21    Q.   This -- this weapon was in a handbag, though, correct?

22    A.   Correct.

23    Q.   And in the trunk at -- closer to the rear of the trunk,

24    correct?

25    A.   Closer to the front actually seat of the trunk.

1   Q.   Okay.  But you did not at that point in time cite anyone

2   for carrying a concealed weapon, correct?

3   A.   Correct.

4        MR. COOK:  Okay.  No further questions.

5        THE COURT:  You may step down.

6   The government may call their next witness.

7        MS. SVOBODA:  Yes, Judge.  Call Greg Kallhoff to the

8   stand, Judge.

9        COURTROOM DEPUTY:  State your full name for the

10  record, please, and spell your last name.

11       THE WITNESS:  Gregory Kallhoff, K-a-l-l-h-o-f-f.

12       COURTROOM DEPUTY:  (Inaudible.)

13       THE WITNESS:  Yes.

14       GREGORY KALLHOFF, PLAINTIFF'S WITNESS, SWORN

15       THE COURT:  The government's witness.

16       MS. SVOBODA:  Thank you.

17                        DIRECT EXAMINATION

18  BY MS. SVOBODA:

19  Q.   Good morning, sir.  Would you mind stating your name one

20  more time.

21  A.   Gregory Kallhoff.

22  Q.   Are you employed, sir?

23  A.   Yes.

24  Q.   By whom?

25  A.   The Nebraska State Patrol.

1    Q.    In what capacity?

2    A.    I am a sergeant -- hold the rank of sergeant, assigned to

3    investigative services.  The position I hold is a drug liaison

4    with the DEA in Omaha, Nebraska.

5    Q.    What are your duties and responsibilities in that -- in

6    that position?

7    A.    I oversee the highway interdiction program in that I do

8    follow-up work after large seizures of drugs, currency or

9    vehicles.

10   Q.    Okay.

11   A.    Follow-up in terms of continued investigation or make

12   sure that they are properly routed through the either state or

13   federal system.

14   Q.    How long have you been doing that?

15   A.    Approximately five years now.  Since 19- -- or 2004.

16   Q.    Sergeant, I'd like to direct your attention to January 3,

17   2008.  Were you called to the Otoe County Sheriff's Office on

18   that day to -- in your DEA -- I should say in your DEA/State

19   Patrol liaison capacity?

20   A.    Yes, I was.

21   Q.    And, ultimately, sir, it was to have -- for you to

22   attempt to speak to Mr. Hitchcock and Mr. Tendler, correct?

23   A.    Correct.

24   Q.    Okay.  Did you ever speak to Mr. Tendler?

25   A.    Yes, I did.

1    Q.   Okay.  And did you speak to Mr. Hitchcock?

2    A.   Yes.

3    Q.   All right.  About what time of day on the -- January 3rd

4    of last year did you come in contact with Mr. Hitchcock?

5    A.   It was in the evening, around 5:10, 1710 military hours.

6    Q.   Okay.  Early dinner hour?

7    A.   Yes.

8    Q.   Where was Mr. Hitchcock when you came in contact with

9    him?

10   A.   He was in a holding cell or in the Otoe County jail.

11   Q.   Okay.  Anybody else in the cell with him?

12   A.   No.

13   Q.   How's he dressed?

14   A.   I believe he was in jail uniform or some type of -- it

15   wasn't civilian garb.

16   Q.   Is he handcuffed?

17   A.   No, I don't believe he was.

18   Q.   Okay.  Do you actually go into the cell to -- to attempt

19   to speak to him or do you stand outside, sir?

20   A.   I think he was brought from that cell to an interview

21   room that they had -- some type of other room other than the

22   cell itself at the jail there.  There was a table, I believe,

23   and -- and chairs -- or at least chairs anyway, but it

24   wasn't -- I don't believe it was the particular cell that he

25   was in.

 1    Q.   Okay.  In this room when you are talking to

 2    Mr. Hitchcock, is it just the two of you?

 3    A.   Yes.

 4    Q.   And is he handcuffed when he's in this room with you?

 5    A.   I don't believe so.

 6    Q.   But he's clearly detained?

 7    A.   Yes.

 8    Q.   All right.  Tell me the first thing you said to

 9    Mr. Hitchcock.

10    A.   I think I identified myself, presented my badge, my

11    credentials so that he would be assured that I was a -- a law

12    officer, that I was representing the State Patrol and the Drug

13    Enforcement Administration at that time.  Then I went forward

14    with letting him know that we were interested in talking with

15    him about a large amount of currency that had been located in

16    the trunk of the vehicle he was either driving or riding in.

17    I don't remember which.

18    Q.   Okay.  How did you --  What did you say to him after

19    that?

20    A.   I believe at that point or somewhere in there, he made

21    known to me that he didn't know anything about the currency or

22    the money that was found in the trunk, but he was very adamant

23    that he had money in the glove box, and I believe it was

24    around $1,000 that he was laying claim or somewhere -- he --

25    he didn't know the exact count from what I remember, but it

1    was around a thousand dollars.

2    Q.    Have you obtained any biographical information from him

3    prior to this?

4    A.    Somewhere in there I asked his, you know, name and date

5    of birth, Social Security number --

6    Q.    Did he give those to you?

7    A.    I believe the -- the name.  He was reluctant to give me

8    other than the city that he lived in.  He wouldn't give me the

9    street address.  And I tried to let him know that there was a

10   possibility -- or we were looking at a forfeiture of this

11   money, and I would need an address to mail the correspondence

12   to, and I wanted a very -- you know, to be very precise about

13   the correct address for the procedures that would follow that

14   we would need to be able to mail to him.

15   Q.    What did he say in response to that?

16   A.    He wouldn't provide me a street address, said the mailing

17   address -- the P.O. Box that was listed or -- on his

18   documentation would be sufficient to get anything to him.

19   Q.    Okay.  Were you still obtaining the biographical

20   information from him when he distanced -- distanced himself

21   from the money found in the vehicle?

22   A.    Yes.

23   Q.    What else, if anything, did Mr. Hitchcock tell you?

24   A.    Well, at the point that he said that the currency -- the

25   large amount of currency found in the trunk -- and I didn't

1    know the count at that time, so it was left as basically an

2    undetermined amount.  At the point he was saying it wasn't

3    his, I had a form that I started to prepare, Voluntary

4    Disclaimer in Ownership -- or of Interest in Ownership in U.S.

5    Currency.  I prepared -- filled out that form and read it to

6    him, and I asked him if he was -- you know, what grade level

7    so that I was -- felt comfortable that he understood and could

8    read the English language, and he had affirmed that he could.

9         I presented the form -- read it and then presented it to

10   him and asked him to sign it since he didn't own -- or didn't

11   exert ownership on that currency.  He read it and said he

12   would not read it without an attorney reviewing it -- or would

13   not sign it.

14   Q.   Okay.

15            MS. SVOBODA:  May I approach, Your Honor?

16            THE COURT:  You may.

17   BY MS. SVOBODA:

18   Q.   Sergeant, I've handed you what has been marked as Exhibit

19   No. 1.  Can you identify it?  And if you can, would you please

20   do so.

21   A.   Yes, this is the form I was referring to, the Voluntary

22   Disclaimer of Interest in Ownership form.  It's an NSP form

23   that we carry or we use if -- if a person does not claim or --

24   or -- or denies ownership in a case that's similar to what I

25   testified to.

1    Q.   There's typing and --

2              THE COURT:  What is that exhibit number again?  I

3    missed it.

4              MS. SVOBODA:  One, sir.

5    BY MS. SVOBODA:

6    Q.   There's typing and there's handwriting on Exhibit No. 1,

7    correct?

8    A.   Yes.

9    Q.   Is the handwriting yours, sir?

10   A.   Yes, it is.

11   Q.   Upon your completion of that form and then Mr. Hitchcock

12   saying he did not want to sign it, did you speak to him

13   anymore?

14   A.   Yes.

15   Q.   What happened then?

16   A.   There were questions then in regard to trying to find out

17   his address or -- or if he had been employed.  I asked him if

18   he had employment.  He said he was employed as a jewelry

19   salesman and that he purchased jewelry over the Internet and

20   then made door-to-door sales.  I'd asked him if he knew his

21   level of income and he said he thought he earned about $5,000

22   in 2007 and 5,000 in 2006 and that he had been unemployed in

23   2005.

24   Q.   Did you ask him anything else, sir?

25   A.   Yes.

1    Q.    What was that?

2    A.    I asked him if he'd received any inheritances to which he

3    said he had from his mother.  He provided a first name but

4    refused to give me a last name for her.

5    Q.    Why?  Do you know?

6    A.    He was --  The questioning -- or the -- he -- he wasn't

7    real forthcoming with -- with trying to answer any of my

8    questions really.  Any --  He -- he became somewhat

9    belligerent and said I didn't need to know that.

10   Q.    Okay.  Sir, if he had already signed -- or, I'm sorry,

11   refused to sign Exhibit No. 1, but he had told you the large

12   amount of money found in the vehicle wasn't his, why were you

13   asking him those questions?

14   A.    Oftentimes I encounter people that initially will deny

15   the money is theirs.  While we're seated together in an

16   attempt to -- they may later come back and claim that it's

17   theirs, and so it at least gives me an avenue of trying to

18   assert that it could be theirs by asking some of those

19   questions, what level of income did he make, did he have

20   inheritances, so those are points that later I could look to

21   either validate or refute his later claim.

22   Q.    While you were speaking to Mr. Hitchcock as you've just

23   described, income, inheritance, had you obtained all the

24   biographical information from him that you'd asked for?

25   A.    No, I didn't get, you know, an address or -- or -- I

1    think I had the Social Security number because it was on a

2    card that was found there, but I had everything but maybe a

3    good address would be probably -- and a good phone number.

4    Q.   Oh, you didn't have a phone number either?

5    A.   Well, I don't recall exactly, but --

6    Q.   Okay.

7    A.   -- there would have been -- anything that I didn't have

8    written down, he was not willing to provide any further

9    information.

10   Q.   Okay.  And when you say anything that you didn't have,

11   what was that?

12   A.   Well, I guess the address would be the main thing, if

13   that was a good address.  Sometimes your address is outdated

14   on your driver's license, for instance --

15   Q.   Uh-huh.

16   A.   -- and so to make sure that it's an updated address

17   that -- that would be the reason for questioning on that.

18   Q.   Okay.  Thank you.  Sir, after you spoke to him about a

19   possible inheritance, did you speak to him about anything

20   else?

21   A.   I think --  I can't recall.  I think that maybe got to

22   the point where he refused to answer anymore questions and

23   said he wanted -- didn't want to talk to me any further.

24   Q.   About how long did the interview last?

25   A.   Well, I started at 1710, I believe, and I see on this

1    form -- it shows 1738 and that would have probably been the

2    ending -- 'cause I had no other way to document it, but I

3    think it was probably -- so it'd be about 28 minutes.

4    Q.   Half an hour?

5    A.   Half an hour.

6    Q.   Okay.  I'm sorry, I don't know if I did this.

7         MS. SVOBODA:  Your Honor, I'd offer Exhibit No. 1

8    into evidence.

9         THE COURT:  You did not.

10        Any objection, Mr. Cook?

11        MR. COOK:  No objection.

12        THE COURT:  Exhibit 1'll be received.

13        MS. SVOBODA:  Thank you.  Judge, I have no other

14   questions for the witness.

15        THE COURT:  Mr. --

16        MS. SVOBODA:  May I --  Would you like me to go up

17   and retrieve the exhibit, Judge?

18        THE COURT:  You can if you wish.

19        Mr. Cook.

20        MR. COOK:  Thank you, Judge.

21                      CROSS-EXAMINATION

22   BY MR. COOK:

23   Q.   Would your proper title be Investigator?

24   A.   I'm actually an Investigative Sergeant, but --

25   Q.   Investigative Sergeant.  I just don't want --

1   A.   That's fine.

2   Q.   -- don't want to offend you.

3   A.   No, you're not going to.

4   Q.   Investigator Kallhoff, when you arrived at the Otoe

5   County Sheriff's Office, was Mr. Hitchcock already dressed in

6   inmate's clothing?

7   A.   Yeah.  Well, yes.

8   Q.   Okay.  You didn't see him searched or anything like that

9   at that point -- during your encounter with him, correct?

10  A.   No.  He was secured inside the facility.

11  Q.   Okay.  How many individuals were in on the interview with

12  Mr. Hitchcock?

13  A.   As I testified earlier, just myself.

14  Q.   Okay.  And this was in a small interview room in the Otoe

15  County Sheriff's Office, correct?

16  A.   Correct.

17  Q.   Did you advise Mr. Hitchcock of his Miranda rights upon

18  initiating the interview?

19  A.   No.

20  Q.   Why?

21  A.   To obtain the background or the bibliography information,

22  usually I don't start that.  I also -- to the disclaimer

23  information or the waiver form is usually a -- the money is a

24  separate -- it's not a criminal action against him.  It's a

25  action against the money, the seizure of it.

 1          So to get -- in order to get the voluntary disclaimer

 2     where he denied -- initially uttered that he -- it wasn't his

 3     money when I explained why I was there, I went through with

 4     the form and would have done Miranda following that normally.

 5     Q.   But you were interviewing him because you believed there

 6     was a possibility that this money was connected to crime in

 7     some way, correct?

 8     A.   That would have been my focus as I moved into the

 9     interview, yes.

10     Q.   And you knew this prior to initiating the interview,

11     correct?

12     A.   Correct.

13     Q.   And you knew that Mr. Hitchcock was driving that car,

14     correct?

15     A.   He was in the car.  I don't remember --  Yeah,

16     somebody -- I don't remember who was driving it, but yes.

17     Q.   So there was a distinct possibility that you were

18     entering into a conversation with Mr. Hitchcock regarding

19     money that was in the car that he was driving that may have

20     been used in criminal activity, correct?

21     A.   Yes.

22     Q.   And this may have been testified to already, but he was

23     not free to leave during this interview, was he?

24     A.   Not leave the facility, but he could have left -- we

25     could have ended the interview, yes.  So he was not free to

1    leave -- to drive away if that's what you mean.

2    Q.   You also testified, and stop me if a misquote this, but

3    that he informed you he did not know about the money in the

4    trunk of that vehicle that he was driving, correct?

5    A.   Yes.

6    Q.   Did he specifically say those words?  He as in

7    Mr. Hitchcock, did he specifically say those words?

8    A.   Well, I'll repeat what I said -- or how I -- you know,

9    in -- it's -- he said -- I -- I said, I'm here to look into an

10   investigation of a large amount of currency that was found in

11   the trunk.  He says, I don't know anything about that, but the

12   money that's in the glove box, and there should be around a

13   thousand dollars, is my money, but it's not part of that money

14   in the trunk.

15   Q.   Did you record this conversation in any way?

16   A.   No.

17   Q.   No notes, anything?

18   A.   I took notes, but once I made my investigative report,

19   those notes are destroyed usually.  Just --  That's our common

20   practice.

21   Q.   Were there any other -- strike that.  As far as the

22   bi- -- bio info is concerned of Mr. Hitchcock, he provided you

23   with everything except for a street address; is that correct?

24   A.   Yes.

25   Q.   Is there any reason why he's required to give you

 1   anything other than a P.O. Box?

 2   A.   He's not required to give me anything, I guess, if he

 3   didn't want to.

 4   Q.   I was going to move on to that.  He's not required to

 5   talk to you at all, is he?

 6   A.   No.

 7   Q.   When you were speaking with Mr. Hitchcock about this

 8   voluntary disclaimer that's marked as Exhibit No. 1 and

 9   received, did you also discuss with him the concept of money

10   laundering?

11   A.   I very possibly could have talked about that.  I don't

12   recall exactly.  I --  If --  It may have been brought up as a

13   point of an investigation could look into that.

14   Q.   And you discussed with that -- you discussed money

15   laundering with him in the context of his signing what's

16   marked as Exhibit No. 1 and received, correct?

17   A.   I'm not sure what you mean.

18   Q.   Your discussions with Mr. Hitchcock involving money

19   laundering was connected to the voluntary disclaimer, correct?

20   A.   Do you mean if --  I'm not sure what you want me to

21   answer, I guess.  That it was -- that I discussed that as I

22   presented the form you mean?

23   Q.   Correct.

24   A.   I don't recall exactly, you know, if that -- where that

25   came in.  If that -- it may have came up about money

1    laundering, about talking about investigating that, but I

2    don't remember if that was when the form was presented.  The

3    form was brought out early, and it was still something -- if

4    he wanted to exert that throughout the time I was there, it

5    was left on the table, so I didn't -- that's why I documented

6    at the end of the interview the time.

7         So the context you're trying to put together is -- is --

8    there was talk of -- of an investigation following into money

9    laundering and needing his help to try and sort it out whether

10   this was involved or not came up through the entire 28 minutes

11   but not at the point when I brought that form out I do not

12   believe.

13   Q.   So the form was just sitting out there during this

14   conversation, correct?

15   A.   I brought the form out when he first denied that it was

16   his money and the form was left -- basically, as I testified

17   it was left on my -- in front of me, it was left in -- on the

18   table in front of him.  When he said he didn't want to sign it

19   without an attorney, I didn't put it away.  I left it laying

20   there.

21   Q.   Okay.  And how long did you continue with that interview

22   once he indicated he wanted to speak with an attorney?

23   A.   I don't remember how many minutes in that he said he

24   wanted an attorney to review that form.  I did --  The entire

25   interview took approximately 28 minutes.

1    Q.   And at no point in time even after discussions of money

2    laundering was Mr. Hitchcock Mirandized, correct?

3    A.   Correct.  The whole 28 minutes never read Miranda to him.

4    Q.   But other than bio -- strike that.  Other than bio

5    information, you also went into issues of income and

6    inheritance with Mr. Hitchcock, correct?

7    A.   Correct.

8    Q.   Investigator, did you specifically inform Mr. Hitchcock

9    that if he claimed that money was his, you were going to

10   proceed with money laundering charges?

11   A.   I don't recall that.  I -- I can't make charges without

12   an attorney, so how could I proceed with...

13   Q.   Did you inform him that you were going to investigate him

14   for money laundering charges?

15   A.   I don't recall and I don't believe so, no.

16   Q.   Did you discuss racketeering with Mr. Hitchcock?

17   A.   It may have been mentioned that as -- as with the

18   investigation of the money that it would be looked at as far

19   as money laundering and racketeering.  Those are part of -- of

20   what -- the nature of what would be looked into.

21           MR. COOK:  I have no further questions --

22           THE COURT:  Miss Svoboda.

23           MR. COOK:  -- at this time.

24

25                     REDIRECT EXAMINATION

1    BY MS. SVOBODA:

2    Q.   Sergeant, did he ask for a lawyer or just say that he

3    wanted to have a lawyer look at Exhibit No. 1?

4    A.   He asked -- he said he would not sign that form, that

5    exhibit, without having an attorney look at it.

6    Q.   Okay.  Thank you, Sergeant.

7            MS. SVOBODA:  Judge, I have no other questions for

8    Sergeant Kallhoff.

9            MR. COOK:  I have no other questions either.

10           THE COURT:  You may step down.  Thank you, Sergeant.

11       Miss Svoboda.

12           MS. SVOBODA:  The United States rests, Your Honor.

13           THE COURT:  What's --  We're going to take a break.

14        Let's find out -- Mr. Cook, what are you anticipating

15   witness-wise?

16           MR. COOK:  I am -- I'm only going to have one

17   witness, Your Honor.

18           THE COURT:  And that will be?

19           MR. COOK:  And that would be Mr. Hitchcock.  What I

20   would like to do is use this break that you so graciously are

21   going to give us to discuss with him -- get an idea of --

22   just -- I just want to look at what's basically been presented

23   so far --

24           THE COURT:  I understand.

25           MR. COOK:  -- and make a decision on that.

```
 1              THE COURT:  Right.

 2              MR. COOK:  I don't anticipate we're going to go past

 3     noon.  I --

 4              THE COURT:  Okay.  I want to see each of you at

 5     sidebar.  We'll take a 15-minute recess.

 6              MR. COOK:  Sure.

 7         (A short recess was had.)

 8              COURTROOM DEPUTY:  Please rise.

 9              THE COURT:  Please be seated.  Back on the record.

10        Mr. Cook.

11              MR. COOK:  Sorry, Judge.  I apologize for the delay.

12     I wanted to discuss everything thoroughly with my client.  We

13     have decided at this point that we are not going to have

14     Mr. Hitchcock take the stand.

15              THE COURT:  All right.  Argument.  Mr. Cook, you can

16     stay seated during argument.  Rather --  I understand where

17     the burdens lie in this case, and there's some issues I wish

18     and hope that each of you'll be able to enlighten me a little

19     bit on, so you can stand or sit as you please, and -- while I

20     understand where the burdens are, I think it's easier,

21     Mr. Cook, if you tell us what you think is wrong and we have

22     Miss Svoboda respond to that and then I'll let you close.

23              MR. COOK:  Your Honor, where I believe the issues

24     lie -- and -- and I'll just -- I'll be very brief.  I believe

25     that there was no -- and I don't like to call people liars.
```

1    Maybe there was a smell of something that resembled marijuana,

2    but myself and my client for that matter have an issue with

3    the fact that there was a supposed smell of marijuana in the

4    first place.

5        There was a previous stop.  There was a citation.  There

6    is a citation in evidence, I believe it's Exhibit 109 of the

7    defense, that shows that this stop occurred.  There's a time

8    that it occurred.  We also know the specific time that the

9    stop of Mr. Hitchcock's vehicle occurred.

10       We're talking almost 670 miles that were traveled here

11   from the first stop to the second stop.  Going the speed

12   limit, which obviously Mr. Hitchcock was not nor his passenger

13   was doing, which -- you know, which brings up another little

14   aside.  I don't know why anyone who would be carrying pounds

15   of marijuana -- although I have seen it in the past -- would

16   be speeding once, let alone twice down the road with that type

17   of -- with -- with a gun, with -- with copious amounts of cash

18   and marijuana in the car.  I don't understand it.

19       You'd think even after -- you know, my argument would be

20   after the first time there's no way that they would have

21   anything illegal in the car to have it happen again --

22           THE COURT:  Well, I agree with you, Mr. Cook, but I

23   have to tell you that after being -- doing this for 28 years,

24   I've even seen so many videotapes of violations that occur

25   with large amounts of cash and drugs in the car that I -- but

1    I am amazed that they do occur, but I do have some at least

2    anecdotal information based on some of the continuing

3    violations that have been on videotape and things like that

4    that I'm fairly amazed how people drive in circumstances that

5    I would be a very cautious driver.

6              MR. COOK:  And -- and -- and then our -- it's

7    argument of -- or argument obviously on our behalf, but the

8    fact that the -- or the citing officer in Kentucky would not

9    smell this marijuana is beyond me when Trooper Bruggeman

10   indicates that it was so strong that as soon as that window

11   was rolled down on the passenger -- or on the driver's side of

12   this vehicle, he instantly smelled it.

13         There was testimony regarding air freshener on the floor.

14   It was testified this was within the driver, Mr. Hitchcock's,

15   grasp.  Although he claims he didn't smell any air freshener,

16   he would have had a chance to do it.  If one wants to think,

17   well, maybe before there was some spray sprayed in the back

18   in -- or in the car and that's why no one smelled it when they

19   were previously stopped.

20         And then beyond that I think you look at the time frames

21   involved between the first stop and the second stop.  There

22   was real no -- there was no time to do anything I would argue

23   or submit to the Court from 4:32 a.m. January 3rd in Christian

24   County, Kentucky, to almost 2 p.m. in the afternoon in Otoe

25   County, Nebraska.  They were actually faster than what

1      MapQuest would tell you they were supposed to get there on if

2      you were to plug that in.

3          I -- you know, so any thoughts that, well, maybe they did

4      something in St. Louis or somewhere between there I think

5      is -- is arguably impossible given the time frames we're

6      discussing here.

7          Beyond that I think this detention is just way too long.

8      This stop was initiated, if I remember correctly, at

9      approximately 1324 military time on January 3rd, 2008.  They

10     weren't even released -- the last testimony indicates that the

11     interrogation by Investigator Kallhoff ended at 1738.  They're

12     still dressed in inmate's clothing and being interrogated at

13     1738 with no charges being filed I might add.

14         And -- and by the I'm going to say arresting but

15     detaining officer's own testimony, the sole basis for

16     Mr. Hitchcock being taken into custody is -- is premised on

17     the fact that they're investigating this marijuana smell

18     and -- and the money that's found and -- but this doesn't end

19     until 1738.  I don't understand how that is not too long based

20     upon the testimony that we have here today, and based upon the

21     length of time and our argument that the search was not a

22     legitimate search or one that was -- that was based upon

23     probable cause, we would ask that this -- the -- the motion

24     excluding the stop be wholly held up by the Court.

25             THE COURT:  Thank you, Mr. Cook.

1          Miss Svoboda.

2              MS. SVOBODA:   Judge, Mr. Hitchcock came in contact

3    with the -- law enforcement by way of the speeding violation.

4    While the officer is up at the vehicle conducting that related

5    investigation, he smells the odor of raw marijuana.  The only

6    testimony before the Court is his testimony that the smell is

7    there.  It's uncontroverted.

8         That gives --  Under Eighth Circuit authority that gives

9    him the authority to search the vehicle.  He searches and he

10   finds a handgun, a shrink-wrappage -- food shrink-wrap machine

11   and money hidden in the wall of the trunk of a rented vehicle.

12        The previous stop in Kentucky, Judge, different driver,

13   different weather conditions maybe, and there's absolutely no

14   testimony about whether or not the stopping officer in

15   Kentucky smelled marijuana or not.  That's simply a red

16   herring.

17        The officer had probable cause to conduct the traffic

18   stop.  He had -- he had probable cause to search the vehicle.

19        As far as the statements that Mr. Hitchcock made to

20   Sergeant Kallhoff, my understanding of the testimony is

21   Sergeant Kallhoff introduces himself and says, I'm here to

22   talk to you about a large sum of money found in the vehicle,

23   and he says, I don't know anything about that, but the money

24   in the glove box is mine.

25        Judge, I submit to you that those -- that -- at least

1    that statement is still admissible because the officer -- or

2    sergeant didn't even have a chance to enter -- to fully

3    introduce himself and try to at least get the biographical

4    information he was there to get.  That's a volunteered

5    statement from Mr. Hitchcock.  I'd submit it on that, Judge.

6              THE COURT:  Mr. Cook.

7              MR. COOK:  Just briefly, Your Honor.  I don't think

8    it's clear on the record that there was anything just blurted

9    out just as soon as he -- the investigator walked into this

10   interview room, and beyond that, Your Honor, it's clear on the

11   record that the investigator knew what he was walking into,

12   that this was an individual by his own testimony that was

13   stopped with a significant amount of cash in the -- in the

14   investigator's mind linked to some type of crime and that my

15   client was driving that vehicle.

16       He knew that there was definitely a possibility that he

17   was entering into a situation where he was interrogating

18   someone that could eventually be charged with a criminal --

19   with criminal conduct; therefore, based upon that I think he

20   should have been Mirandized init- -- you know, as soon as he

21   walked in the room, and I don't think that any of those

22   statements made by my client during that interrogation should

23   be admissible.

24             THE COURT:  Okay.  I'm prepared to rule on the record

25   at this time.  Let's start with the first issue of the stop,

1    and that portion of the brief and the claim in defendant's

2    {sic} motion to suppress, number 28, was withdrawn, and so

3    I'll just note for the record that the reason for the stop was

4    speeding.

5        Then we move to the issue of a factual finding in this

6    matter.  I find that officers -- that Trooper Bruggeman and

7    Sergeant Investigator Kallhoff are credible in their testimony

8    today, and I viewed the -- I also viewed the exhibits and that

9    nothing contradicts their testimony within the exhibits

10   although I'll note the exhibits obviously are the best

11   evidence of what occurred as to the things that the exhibits

12   reflect, so we have the reason for the stop.

13       Then we have factually the findings that the stop

14   occurred at approximately 1:52 p.m. on January 3rd, 2008, that

15   the trooper after initiating the stop and informing the

16   defendant of the reason for the stop interspersed questions of

17   background information with some other questions about trip

18   and reasons for the trip and where the individual was going;

19   however, I'll note that the entire matter was concluded by the

20   trooper in less than ten minutes, actually five or six

21   minutes, before he did issue the speeding citation and

22   returned the paperwork to the defendant in this case.

23       The --  Then I will note that the trooper stated that he

24   smelled raw marijuana in the very beginning when he first

25   approached the vehicle and he smelled it on the person of --

1   of the claimant in this matter -- and I referenced defendants.

2   I'm sorry.  I usually do these suppressions obviously for

3   defendants more than claimants.  -- the claimant in this case,

4   smelled it also -- the trooper smelled it after the claimant

5   had been removed to the trooper's vehicle, continued to smell

6   the odor.  I find that that's credible testimony and that it's

7   not contradicted.

8       And specifically I would note as to the information on

9   the Kentucky stop, there are a lot of variables in this

10  situation.  I don't know that we had a different driver.  We

11  obviously had a different time of day.  We have different

12  temperatures.  We have different wind factors, and we may well

13  have different olfactory talents or lack thereof by the two

14  individuals who were involved in stopping vehicles as to what

15  was smelled or not smelled, and the -- and actually the bottom

16  line is we don't know what was smelled.  I mean, one could

17  assume that since nothing happened that the officer in

18  Kentucky didn't smell raw marijuana, but we don't know that.

19  It just --  The information while admissible, I think, is not

20  of much weight in this case.

21      So having found that and found that after then giving the

22  citation to Mr. Hitchcock the trooper then asked for

23  permission to search which was denied which is certainly

24  within Mr. Hitchcock's legal rights, and at that time then the

25  trooper informed Mr. Hitchcock that a search would occur based

1    upon his belief that -- the trooper's belief that he had

2    probable cause to search based upon the smell of -- of raw

3    marijuana.

4         And it is clear under the law that police may search a

5    car without a warrant if they have probable cause to believe

6    that a car contains contraband or evidence, *United States vs.*

7    *Neumann*, 183 F.3d 753 at Page 756, Eighth Circuit, 1999.  The

8    Eighth Circuit has consistently found that the smell of

9    burning or raw marijuana is, in fact, probable cause for the

10   search of a vehicle without consent.

11        So in this case it's the government's burden without

12   consent or without a warrant to show how the car was searched,

13   and in this case I find based upon my factual findings as to

14   credibility as to what happened that the length of detention

15   was not long, that in this case it was just seconds after the

16   completion of the gaining of the information about the records

17   and -- and driving information about the defendant -- claimant

18   and his passenger.

19        And it -- and the Circuit has also held that it's okay to

20   blend those questions as to biographical background

21   information, driving information and travel information as

22   long as it does not become unduly lengthy in its -- in its

23   duration.  In this case, we had very, very short duration

24   traffic stop.  Actually, almost amazingly short considering

25   the circumstances.

1      So the search is based upon probable cause finding

2    Bruggeman to be -- Trooper Bruggeman to be credible in this

3    matter and that probable cause did exist for the search of the

4    vehicle.

5      Then we move factually to the fact that the -- the search

6    occurred, items were found, and they are -- that portion of

7    the motion is denied.

8      Then the claimant and his passenger are moved to the jail

9    facility sometime in the early part of the afternoon, 2:00 to

10    2:30, and then we have a questioning session that begins at

11    1710, which is 5:10, and goes to 5:38 by Investigator Sergeant

12    Kallhoff.  I find Investigator Sergeant Kallhoff to be

13    credible maybe somewhat based on the ruling to the detriment

14    of his position.

15      Because it's my finding, first of all, that the length of

16    detention in regard to its coercive nature as Mr. Cook points

17    out troubles me although that's not the real basis of my

18    ruling, but I do find in this case that there is custody, the

19    individuals were at the jail, they were -- went through some

20    kind of a booking facility or -- or process, although it's not

21    clear, they were in jail clothing although they were not

22    handcuffed.  They were clearly not free to leave.  They were

23    in custody.  That's the first prong of Miranda.

24      The second prong of Miranda is the interrogation prong.

25    Now, I understand the government's position in this case based

1    upon the testimony of Kallhoff is that they're there trying to

2    clear up this quasi civil issue as to who has the money, but

3    Kallhoff was extremely frank in his testimony and in his

4    admissions that he made about the questions that were asked.

5        Now, while we don't know exactly the order that these

6    occurred in, we know that there was some discussion also about

7    money laundering admitted by Kallhoff, there was a discussion

8    about racketeering, there was discussion about Mr. Hitchcock's

9    income, there was discussion about Mr. Hitchcock's

10   inheritance.  All of which I find are outside of what might

11   be -- and I'm really hesitant to say for sure about this --

12   what might be the ability of law enforcement to come in

13   without Miranda warnings, and I find factually that no Miranda

14   warnings were given.

15       But even without that I'm a little troubled by law

16   enforcement arriving with form 109 -- excuse me, form -- the

17   disclaimer form which is Exhibit No. 1 and starting to talk

18   about these things, because this gets very close to the area

19   where you're talking about something that the investigation is

20   involving, and I don't think it's much of a stretch at all to

21   find out -- to find or conclude, but I'm not so concluding at

22   this time, that even that kind of a contact with a disclaimer

23   form might not require Miranda because it would lead to

24   questioning -- expressed questioning that police should know

25   would reasonably likely elicit incriminating responses, *Rhode*

1    *Island vs. Innis*, 446 U.S. 291, a 1980 case.

2         But in this case, I just don't have Exhibit 1 coming

3    forth and being talked about.  We have the additional

4    conversation in this case which deals -- as Sergeant

5    Investigator Kallhoff talked about, they're talking about

6    racketeering, money laundering investigation, Mr. Hitchcock's

7    income, his inheritance or lack thereof.  In this case, I have

8    actual additional facts that lead me to conclude that this --

9    these are questions -- expressed questions that law

10   enforcement should be aware would reasonably likely to elicit

11   an incriminating response in an investigation.

12        And in this case, I find that that occurs from the

13   very -- the very beginning because I -- I can't -- I realize

14   Miss Svoboda's comment about when certain things occur, but

15   I'm not that sure about when certain things occurred, I don't

16   think Kallhoff was, and so it's so intermixed in this case --

17   this is different than the situation where the Circuit --

18   Eighth Circuit has said during the time the police -- law

19   enforcement have a stop and they're doing the background

20   information, they can intersperse travel and these type of

21   thing -- type of questions and background questions.

22        That's different.  This isn't that situation in a traffic

23   stop.  This is one in custody in a law enforcement facility,

24   and I think in this case Miranda -- because there's custody

25   and expressed questioning reasonably likely to elicit

1  incriminating statements where Miranda should apply, and in

2  this case factually in my finding does apply because of the

3  circumstances, and I exclude all testimony -- or all comments

4  made by Mr. Hitchcock to Investigator Sergeant Kallhoff at the

5  time of their speaking in the law enforcement facility.

6      So the conclusion is this:  For the reasons set out in --

7  on the record, the motion to suppress, number 28, is granted

8  in part and denied in part.  It is denied as to the search of

9  the vehicle and the -- since there was nothing wrong with the

10 stop or the search, there is -- and there is, therefore, no

11 taint to any of the items seized from the search of the

12 vehicle, so it is denied as to the search of the Cadillac.

13     It is granted as to all statements made by Claimant

14 Hitchcock to Investigator Sergeant Kallhoff.

15     Mr. Cook, is there anything else I could do for you or

16 Mr. Hitchcock this morning?

17         MR. COOK:  I don't believe so, Your Honor, no.

18         THE COURT:  For the defendant?  Miss Svoboda?

19         MS. SVOBODA:  No, Judge.

20         THE COURT:  Other than we're going to need a trial

21 date --

22         MS. SVOBODA:  Right.

23         THE COURT:  -- at some point in time --

24         MS. SVOBODA:  That's --

25         THE COURT:  -- but how do you want to handle that?

1    You want to -- you want to have a conference to talk about

2    that later?  Do you want to do that now?

3         MR. COOK:  I would -- well, the only reason I would

4    say later, Your Honor, is just because of the nature of my --

5    my client and another witness -- well, a couple other

6    witnesses living out of state quite some distance --

7         THE COURT:  I have no problem with later.

8         MR. COOK:  -- so I would like to do it later, I

9    guess.

10        THE COURT:  Yeah, I'm not -- I'm not pressing for it

11   to be determined now.

12      Miss Svoboda, is that okay with you?

13        MS. SVOBODA:  Sure, Judge.  Do you want us to maybe

14   set up a telephone conference or something?

15        THE COURT:  Why don't you -- why don't you do that.

16   Unfortunately, or fortunately maybe, next week I'm going to be

17   away --

18        MS. SVOBODA:  Right.

19        THE COURT:  -- at the Eighth Circuit meeting, but we

20   could set it up with -- with -- just call Angie in my chambers

21   and we'll get it set up, and -- sometime after the first week

22   in -- we could have the conference after the first week in

23   August and then we can decide about travel schedules.

24        MS. SVOBODA:  Okay.  I'll -- I'll line that up with

25   Mr. -- with Mr. Cook next week, Judge, and we'll set something

1      up for this month.

2              THE COURT:  All right.

3              MS. SVOBODA:  August.

4              THE COURT:  We're in recess.

5              MS. SVOBODA:  Thank you, Judge.

6              THE COURT:  Thank the lawyers for their work.

7              MR. COOK:  Thank you, Judge.

8          (Adjourned at 11:52 a.m.)

9

10      I, Rogene S. Schroder, certify that the foregoing is a

11   correct transcription to the best of my ability from the

12   digital recording of the proceedings held in the

13   above-entitled matter.

14          s/Rogene S. Schroder            August 25, 2009
               Transcriber                      Date
15

16

17

18

19

20

21

22

23

24

25

```
1                              I-N-D-E-X

2                              Direct  Cross  Redirect  Recross

3       WITNESSES:
        FOR THE PLAINTIFF:
4
        Kaleb Bruggeman            4      26       41        42
5
        Gregory Kallhoff         43      52       59
6


7                                                    Ruled
        MOTIONS:                          Made        On
8
        Claimant's Motion to Sequester     3          3
9


10                                                   Ruled
11      EXHIBITS:                        Offered      On

12        1.  Copy of Voluntary Disclaimer  52        52

13        4.  Video of Traffic Stop          3         3

14      109.  Copy of Citation             26        26

15

16

17

18

19

20

21

22

23

24

25
```